UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Peter J. Todd,                                                  Civil No. 08-444 (JRT/FLN)

        Plaintiff,

        v.                                                  **REPORT AND
                                             RECOMMENDATION**

Michael J. Astrue,
Commissioner of Social Security,

        Defendant.

_____

James R. Roth and Frank W. Levin for Plaintiff.
Lonnie F. Bryan, Assistant United States Attorney, for Defendants.

_____

      Plaintiff Peter J. Todd seeks judicial review of the final decision of the Commissioner of

Social Security ("Commissioner"), who denied his application for disability insurance benefits

("DIB.") See 42 U.S.C. §1382(c).  The matter was referred to the undersigned United States

Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

This Court has jurisdiction over the claim pursuant to 42 U.S.C. § 405(g).  The parties have

submitted cross-motions for summary judgment. (Dkt. Nos. 26 and 30.)  For the reasons which

follow, it is this Court's recommendation that the Commissioner's decision be **REVERSED** and the

case be **REMANDED** to the Commissioner for the immediate calculation and award of benefits.

## I.    INTRODUCTION

      Mr. Todd applied for DIB on April 18, 2003, claiming he had been disabled since May

10, 2002. (Transcript of Record at 107.)  His primary alleged impairment is mental impairment

stemming from a traumatic brain injury ("TBI"), and his secondary alleged impairments are

diabetes and a neck injury. (Tr. 104, 555.)   The Social Security Administration denied his

application for benefits initially on August 12, 2003, and again upon reconsideration on

November 21, 2003. (Tr. 42-43, 44-46.)  Mr. Todd timely filed a request for a hearing, which

was held before Administrative Law Judge ("ALJ") Roger W. Thomas on September 20, 2005.

(Tr. 400-09.)  At the hearing, Mr. Todd was represented by counsel and both a medical and a

vocational expert appeared and testified. (Tr. 402.)  The ALJ rendered an unfavorable decision

on November 16, 2005, finding that Mr. Todd was not disabled within the meaning of the Social

Security Act because Mr. Todd had the residual functional capacity ("RFC") to perform a

significant number of  jobs existing in the national economy. (Tr. 400-09.)  Mr. Todd appealed

the unfavorable decision to the Appeals Council, which, in a May 3, 2006 Order, vacated and

remanded the case to the ALJ for a new hearing. (Tr. 419-422.)  Upon rehearing, the ALJ again

denied Mr. Todd's claim in an August 29, 2006 decision. (Tr. 21-33.)  Mr. Todd filed a request

for rehearing with the Appeals Council on September 6, 2006, which was denied on December

20, 2007, leaving the ALJ's 2006 decision as the final decision of the Commissioner. (Tr. 20, 12-

15.)  On February 14, 2008, Mr. Todd commenced this civil action in federal court seeking

review of the Commissioner's decision.  (Dkt. No. 1.)  The Commissioner answered on April 22,

2008, and both parties have submitted cross-motions for summary judgment. (Dkt. Nos. 4, 26,

30.)

## II.    STATEMENT OF FACTS

### A.    Background

Mr. Todd was born on February 21, 1958 in St. Paul, Minnesota. (Tr. 101.)  He was 44

years old at the onset of his disability in May 2002, and 48 years old at the time the ALJ issued

his decision in August 2006.  (Tr. 101, 21-33.)  Mr. Todd's brother, Michael T. Todd, was

appointed Mr. Todd's Conservator on January 22, 2003. (Tr. 106.) Mr. Todd suffered a traumatic brain injury from a car accident in 1977, when he was 19 years old. (Tr. 104.) In addition to the mental impairments arising from his TBI, such as fatigue, impaired concentration, impulsivity, and decreased social functioning, Mr. Todd also suffers from diabetes (since age 28), neck and arm pain stemming from herniated disks, depression, and is a recovering alcoholic. (Tr. 212, 554-55,558-59, 563.)

Mr. Todd has a high school education and earned an Associates Degree in electronics in 1978. (Tr. 95.) Between 1987 and 2001, Mr. Todd worked 13 different jobs, including working as an assembler, an electronic technician, a telemarketer, and a field engineer. (Tr. 120.) Later, from August 2001 until May 2, 2002, he worked as a packager in a chemical plant. (Tr. 171.) Finally, he worked part-time at Arby's until he was terminated because he could not meet the demands of the job. (Tr. 171, 557-558.)

Mr. Todd lived with his brother, Michael Todd, for a period of time beginning in October 2001, and later moved into an assisted living facility in Hastings, where he has resided since 2002-03 . (Tr. 194, 560, 577.) The assisted living facility provides Mr. Todd with meals. (Tr. 561.) Mr. Todd employs Mr. Dick Carlson as his independent living skills assistant to help him with state and county forms, finances and budgeting, and grocery procurement. (Tr. 568.)

### B.    Medical Evidence - General Physical Health

Mr. Todd suffered a TBI in 1977 as a result of a car accident. (Tr. 104.) He was a passenger in a vehicle that left the road, and he was thrown from the vehicle. (Tr. 200.) As a result, he was comatose for three days, and suffered a severe head injury and retrograde amnesia.

3

(Tr. 200.)

Mr. Todd first saw Dr. Bruce Hoggarth, M.D., in December 2001. (Tr. 282.)  Dr.

Hoggarth monitored his diabetes and treated him for general illnesses such as a sore throat.  (Tr.

271-82.)  Dr. Hoggarth noted in November 2002 that Mr. Todd has had problems in the last five

years in terms of working with people ever since his TBI occurred, but stated that "it would

appear that Peter could do a physical job or any work that did not involve close work with other

individuals and I will make that recommendation." (Tr. 274.)  Dr. Hoggarth also noted in April

2003 that Mr. Todd might be able to work a part-time job and that his diabetes were under

reasonable control although he had two recent low blood sugar readings while doing yard work.

(Tr. 271.)  In response to a questionnaire submitted to Dr. Hoggarth after the 2006 hearing, Dr.

Hoggarth reported that at the time he examined Mr. Todd in April 2003, Mr. Todd was unable to

work full time.  (Tr. 543-45.)  Dr. Hoggarth also reported that he does not usually opine in his

reports about whether or not a patient can work full time unless specifically requested to do so.

*Id.*

Mr. Todd first saw Dr. R. Marie Langer, M.D. in October 2003 for hypoglycemia and

insulin-dependent diabetes.  (Tr. 311.)  He had just begun living in the Oak Ridge assisted living

facility.  *Id.*  Besides insulin, Mr. Todd was taking one baby aspirin per day.  *Id.*  In addition to

diabetes management, from 2003 to 2005 Dr. Langer treated and managed his general health,

diet, high cholesterol, left knee cellulitis, left facial lesion from a basal cell carcinoma, suture

removal from a right cheek biopsy, toe pain, and neck, shoulder and arm pain.  (Tr. 309-312,

348-50, 379, 493-97.)  On October 11, 2004, Dr. Langer noted that Mr. Todd had trouble

managing his blood sugar while working part-time at Arby's because he gets really busy and

"does not eat the way he is supposed to."   In response to a questionnaire submitted to Dr.

Langer after the 2006 hearing, Dr. Langer reported that at the time she examined Mr. Todd in

August 2005, Mr. Todd was unable to work full time.  (Tr. 546.)  Dr. Langer also reported that

she does not generally opine in her charts about whether or not a patient can work full time

unless specifically requested to do so.  *Id.*

Mr. Todd went to the Burnett Medical Center emergency room in Grantsburg, WI for a

hypoglycemic reaction in July 2005, and he went to the Regina Medical Center in Hastings, MN

for a hypoglycemic reaction in August 2005.  (Tr. 384, 468-476.)

In August 2005, Dr. Langer saw Mr. Todd for issues stemming from his TBI, including

significant difficulty in concentration and memory.  (Tr. 516.)  Dr. Langer noted that Mr. Todd

has significant trouble with frustration level and with anger management when he feels hurried

or rushed.  *Id.*  Mr. Todd reported he had recently lost his job at Arby's because he was having

difficulty with concentration and ability to keep up.  *Id.*  She strongly recommended additional

formal neuropsychological testing because his last formal testing was in 2000 or 2002.  *Id.*  Dr.

Langer also recommended Mr. Todd switch to a longer-lasting insulin to better control his blood

sugar but noted he was very resistant to the change, which Dr. Langer partially attributed to

discomfort with learning a new insulin-sliding scale and a new insulin schedule.  (Tr. 515.)

Dr. Daryll C. Dykes, M.D., reported in January 2006 that Mr. Todd had a greater than

three-month history of neck and right upper extremity radicular pain.  (Tr. 537.)  Physical

therapy and anti-inflammatory pain medication had not given him significant benefit.  *Id.*

Relying on an MRI scan of Mr. Todd's vertebrae, Dr. Dykes recommended surgical intervention.

(Tr. 537-538.)  Three months after his surgery, Dr. Dykes reported that Mr. Todd had no

significant pain or limitations although he had some persistent stiffness in his neck.  (Tr. 531.)

Overall, Dr. Dykes noted an "excellent postoperative course," and recommended continuation of

his "current activities as tolerated."  *Id.*

###   C.   Medical Evidence - Mental Health

In January 2002, Mr. Todd underwent a psychological evaluation conducted by

psychologist Phillip Sarff, Ph.D.  (Tr. 194.)  The purpose of the evaluation was to assess

cognitive strengths and weaknesses and emotional and behavorial stability for the purpose of

vocational planning.  *Id.*   Mr. Todd presented with a history of TBI, diabetes, a broken hip,

knee problems, and a history of chemical abuse.  *Id.*   Mr. Todd reported he has never been

hospitalized for mental health treatment and has never been treated with psychotropic

medications.  (Tr. 195.)  He was diagnosed with diabetes in 1986 and is insulin-dependent.  *Id.*

Dr. Sarff reported that although Mr. Todd was functioning in the high average range of

intelligence compared to other American adults of his age, his performance tests indicated

possible problems with mental processing speed. (Tr. 197.)  Mr. Todd's profile also indicated

that he would be likely to have long-term interpersonal difficulties and may avoid close social

contact at work, and therefore he might prefer to work independently. (Tr. 198-199.)  He is not

likely to initiate conflict with co-workers. (Tr. 199.)  Dr. Sarff reported that Mr. Todd should be

encouraged to seek mental health treatment and possibly psychotropic medications to improve

his mood, but that he possesses sufficient emotional and behavioral stability to participate

effectively in vocational planning and rehabilitation.  *Id.*  Mr. Todd was diagnosed with

cognitive disorder NOS[1] with deficits in information processing speed and concentration,

secondary to a head injury; episodic alcohol abuse; and personality change due to brain injury,

apathetic type.  (Tr. 198.)  Dr. Sarff opined that Mr. Todd showed subtle signs that he may have

trouble initiating things, which some may interpret as slowness or poor motivation, but that this

is not uncommon in individuals with certain types of frontal lobe brain injuries.  (Tr. 198.)  Dr.

Sarff did not express an opinion as to whether Mr. Todd could work full time.  (Tr. 194-99.)

From May 16, 2002 to June 19, 2002, Mr. Todd participated in the outpatient chemical

health program at Vinland Center, an institution for treatment of victims with TBI.   (Tr. 164,

210.)  Jean Strobel, Mr. Todd's Chemical Health Case Manager at Vinland, reported that he

suffers from depression, lacks insight into the harmful effects alcohol and cannabis have had on

his life, and has difficulty admitting chemical abuse.  (Tr. 217-18.)  Strobel's report indicated

that Mr. Todd's Global Assessment of Functioning (GAF) score was 60[2], and stated that she

based this report on medical records and Mr. Todd's self-report.  (Tr. 217.)   On June 17, 2002,

Dr. Nancy Carlson, Psy.D., administered 17 tests to Mr. Todd and reported that his intellectual

functioning was in the average to high average range, his memory was at least in the average

---

[1]NOS stands for "not otherwise specified," and refers to a category of cognitive disorders characterized by cognitive dysfunction presumed to be due to the direct physiological effect of a general medical condition (*e.g.*, head trauma).  *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)* 163 (4th ed., American Psychiatric Association, 1994)(hereinafter "DSM-IV").

[2] The GAF Scale considers psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness.  It does not include impairment in functioning due to physical or environmental limitations.  A GAF score of 51-60 is indicative of moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) OR any moderate difficulty in social, occupational, or school functioning (*e.g.*, no friends, conflicts with peers or co-workers).

range, and his attention, concentration, and judgment were intact. (Tr. 200-06.)  However, he had difficulty with processing speed and the difference between his verbal IQ and performance IQ scores suggested more nonverbal processing difficulty. (Tr. 206.)  Mr. Todd reported to Dr. Carlson that he has ongoing anger issues, and testing suggested a general discomfort with himself and more subtle traits of paranoia, which could affect his judgment and ability to interact with others. (Tr. 206.)  Dr. Carlson noted that prior medical records showed that Mr. Todd has a memory deficit, concentration difficulties, and some word-finding difficulties, as well as alcohol dependence and cannabis dependence. (Tr. 201.)  Mr. Todd reported to Dr. Carlson that since his accident in 1977 he has noticed changes such as balance difficulties, learning problems, problems with multi-tasking, and anger issues. (Tr. 203.)  Dr. Carlson recommended Mr. Todd contact the Brain Injury Association of Minnesota for available services, but did not opine on whether Mr. Todd could work full time. (Tr. 206.)

Dr. Michael Scott, Psy.D., saw Mr. Todd for 19 sessions in 2002 and 2003, and opined that Mr. Todd had alcohol dependence in full remission, dysthymic disorder[3], and cognitive disorder NOS (post-concussive disorder.) (Tr. 336.)  Dr. Scott assessed his Global Assessment of Functioning (GAF) at a score of 50.[4]  *Id.*   During the course of Dr. Scott's contact with Mr.

---

[3]The essential feature of dysthymic disorder is a chronically depressed mood that occurs for most of the day more days than not for at least two years.  Individuals with dysthymic disorder describe their mood as sad or "down in the dumps." During periods of depressed mood, at least two of the following additional symptoms are present:  poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration or difficulty making decisions, and feelings of hopelessness.  DSM-IV at 345.

[4]A GAF score of 41-50 is indicative of serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, inability to keep a job.) DSM-IV at 32.

Todd, Dr. Scott observed that he was significantly impaired in terms of his ability to develop
insight into his situation, including, for example, the nature and scope of his alcoholism. (Tr.
337.)  During the contact, Mr. Todd remained largely reclusive and isolated, which Dr. Scott
partially attributed to living with his brother, having limited funds, and having no transportation,
but he noted a strong element of introversion and social avoidance. *Id.*  Dr. Scott also reviewed
Dr. Carlson's cognitive evaluation, and stated that her assessment documents Mr. Todd's
cognitive limitations.  *Id.*

In August 2003, Dr. Gregory Korgeski, Ph.D., L.P., a State Agency Psychological
Consultant,  issued a report based on a review of Mr. Todd's medical evidence of record. (Tr.
314.)  At the request of the state agency, Dr. Korgeski was to determine Mr. Todd's Mental
Residual Functional Capacity ("MRFC") and determine whether his impairment met or equaled
a listing (Tr. 314-335.)  Dr. Korgeski determined that Mr. Todd has a severe impairment which
does not meet or equal a listing, and that with respect to his MRFC he retains the ability to:
concentrate on, understand, recall one or two-step instructions; carry out simple, routine tasks
with adequate persistence, pace, and quality for entry-level competitive work; tolerate routine,
superficial public contact and contact with co-workers; tolerate supervision that is not unusually
critical, and; adapt to only routine changes in work setting.   (Tr. 322, 333.)  Dr. Korgeski noted
Mr. Todd had a markedly limited ability to understand, remember, and carry out detailed
instructions, and found a moderately limited ability to:   maintain attention and concentration for
extended periods; work in coordination with or proximity to others without being distracted by
them; complete a normal workday and workweek without interruptions from psychologically-
based symptoms and to perform at a consistent pace without an unreasonable number and length

of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to respond appropriately to changes in the work setting. (Tr. 314-15.)  Dr. Korgeski found that Mr. Todd had no significant limitations in:   remembering locations and work-like procedures; understanding, remembering, and carrying out very short and simple instructions; maintaining attention and concentration for extended periods; sustaining an ordinary routine without special supervision; making simple work-related decisions; or asking simple questions or requesting assistance.  *Id.*  Dr. Patrick Shields, Ph.D., L.P., another State Agency psychologist, affirmed Dr. Korgeski's report in November 2003, stating he had examined Mr. Todd's medical file and that he supports Dr. Korgeski's findings.  (Tr. 314, 319.)  Neither Dr. Korgeski or Dr. Shields examined Mr. Todd in person. (Tr. 314-335.)

Dr. Laraine Walker, Ph.D., L.P., examined Mr. Todd on August 24, 2004, and diagnosed him with dysthymic disorder, avoidant personality, and a GAF score of 40.[5]  (Tr. 345-346.)  Dr. Walker opined that Mr. Todd is "certainly disabled," primarily due to his TBI and apparent memory impairments as well as some self-esteem issues related to his tendency to be avoidant and withdrawn and his self image as one who does not stand up for himself.  (Tr. 346.)  Dr. Walker reported that the dysthymic disorder and the avoidant personality disorder are "secondary complications of the primary disorder of memory and possibly concentration and judgment."  *Id.*

---

[5]A GAF score of 31-40 is indicative of some impairment in reality testing or communication (*e.g.*, speech is at times illogical, obscure or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (*e.g.*, depressed man avoids friends, neglects family, and is unable to work). (DSM-IV at 32.)

Due to his trouble with cognitive functioning, Dr. Langer referred Mr. Todd to Dr. Colleen Daniewicz, Psy.D., whom he saw on September 7, 2005 for an initial interview and for three additional 1 or 1.5-hour test sessions in September, October, and November of 2005.  (Tr. 519-30.)  Dr. Daniewicz diagnosed Mr. Todd with cognitive disorder NOS, depressive disorder NOS, anxiety disorder NOS, dementia due to head trauma, and avoidant personality traits.  (Tr. 520.)  At the initial interview, Dr. Daniewicz assessed a GAF score of 45 to 50, and later in November 2005 assessed a GAF score of 40 to 45.[6]  (Tr. 520.)  Mr. Todd's test sessions were kept short in order to reduce his fatigue and frustration and to minimize reduction in test scores due to fatigue.  (Tr. 529.)  He appeared to fatigue easily at the end of each hour and his effort declined slightly at the end of each hour.  *Id.*  When fatigued, he seemed more easily frustrated, impulsive, and haphazard.  *Id.*  Dr. Daniewicz noted that Mr. Todd has had ongoing difficulty sustaining jobs and opined that Mr. Todd's impairment has become chronic without much improvement.  *Id.*

**D.    Non-Medical Evidence**

Ms. Lori Spalding, Mr. Todd's case manager at Carver County Human Services Community Alternative for Disabled Individuals ("CADI"), wrote letters in support of Mr. Todd's disability application dated February 20, 2004 and December 27, 2004.  (Tr. 178, 338.)  She reported Mr. Todd had lost jobs due to his inability to work well with others and his inability to perform job tasks.  *Id.*   She also states that Mr. Todd has a long history of inability to manage his finances and paperwork because he lacks the judgment and insight to remember his financial

---

[6] A GAF score of 41-50 is indicative of serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, inability to keep a job.) DSM-IV at 32.

priorities.  *Id.*   This has resulted in having his car repossessed and his filing for bankruptcy.  *Id.*

Ms. Spalding reported that Mr. Todd's brother became his conservator because Mr. Todd was

unable to manage his finances, and that CADI pays an Independent Living Skills worker to see

Mr. Todd weekly to help him stay on his budget.  (Tr. 178.)  She noted that this intense level of

service has been provided because Mr. Todd continues to get into debt.  *Id.*

Ms. Wendy Forsyth, a Career Rehabilitation Counselor for the State of Minnesota

Department of Employment and Economic Development, worked with Mr. Todd from February

2002 through 2004, and stated in a March 2004 letter that despite his prior employment,

placement staff has had much difficulty with Mr. Todd because of his inability to follow through

on getting, completing, and dropping off applications with employers. (Tr. 339.)  Ms. Forsyth

reported that he demonstrates poor frustration tolerance, quickly shuts down when he is unable

to complete a task, has very minimal insight into his limitations and the long term effects of his

TBI.  *Id.*  Although Mr. Todd is participating in work adjustment/evaluation, she opined that Mr.

Todd will need much preparation for community employment and will need much support with

his future employment.  *Id.*  She stated that she expects he will be extremely limited in the

number of hours he will be able to work because of the fatigue and stress that will result with

employment.  *Id.*   Additionally, she noted that in the time she has worked with Mr. Todd, she

has seen his cognitive abilities deteriorate and that he seems unable to plan and follow through in

both personal and vocational pursuits.  *Id.*

Ms. Bethany Johnson, Mr. Todd's Case Manager at ProAct, Inc., an organization helping

him look for employment, reported in  December 2004 that he found a job at Arby's after

looking for two months with the help of ProAct's Vocational Department.  (Tr. 180.)  Although

the Arby's management is very supportive, they let Mr. Todd go because he was not able to keep

up with his job duties in a timely manner.  *Id.*  While other employees increase their speed as

they learn the duties, Mr. Todd remained at the same speed.  *Id.*  He got frustrated because he

was not able to keep up, but keeps trying and maintains a decent attitude.  *Id.*

      Mr. Dick Carlson, CADI-funded Resource Counselor, stated in May 2005 that Mr. Todd

needs assistance with tasks like household budgeting, paying bills, and completing paperwork

because he is not able to complete these simple tasks due to mental reasoning impairment. (Tr.

388.) Mr. Carlson reported resistance to tasks requiring an effort to concentrate, stating Mr.

Todd wants to be able to concentrate but is not able to. (Tr. 389.)

      Ms. Lori Besser, a Vocational Coordinator at ProAct, Inc., stated in May 2005 that Mr.

Todd has difficulty multi-tasking and working at a competitive pace, and that he needs a job that

does not require speed or multi-tasking.  (Tr. 396.)  She stated that he is a hard worker and wants

to work, but his limitations interfere with finding and maintaining competitive employment.  *Id.*

### E.     Plaintiff's Testimony

      At the administrative hearing of August 2, 2006 in front of ALJ Roger W. Thomas, Mr.

Todd testified to his job history, impairments, and daily life. (Tr. 555-66.)  Mr. Todd testified

that he has not had a full-time job since May of 2002, and that he had worked in jobs such as

restaurant help, stocking help, packaging, manufacturing, and sprinkler installation.  (Tr. 555-56)

He had a part-time job at Arby's after May 2002, but stated that he had some difficulty with the

cash register, and, in his manager's view, could not perform the job adequately and was

criticized about  his ability to get along with others. (Tr. 557-58, 565.)  Mr. Todd testified he

believes he could probably do a simple, low-stress job eight hours a day five days a week

depending on the frustration level of the job, and that sometimes the really low-level jobs that do not require much thinking cause him more frustration.  (Tr. 565.)  He testified that when he gets frustrated, it affects his ability to get along with co-workers and supervisors. (Tr. 565.)

Mr. Todd testified that he recently had successful neck surgery for neck and arm pain, and that he has diabetes for which he must check his blood sugars, and for which he administers insulin dosages himself.  (Tr. 558-59.)  He testified that he lives in Hastings, MN and sees his brother Michael Todd, who lives in Waconia,  three or four times a year. (Tr. 559-560.)

Mr. Todd testified that he lives in assisted living, where he receives meals.  (Tr. 560.)  He testified he believes he could live independently, that he does his own laundry, and that he cooks if the meals provided do not "agree" with him.  (Tr. 560-61.)  Mr. Todd does not have a car, and although he still possesses his driver's license, his brother has recommended he not have a license. (Tr. 561-62.)  Mr. Todd testified that he disagrees with his brother about the license, stating he believes he can drive safely and wants to keep his license so he could drive if necessary, like to keep a drunk driver from getting behind the wheel. (Tr. 562-63.)  Mr. Todd testified that he drinks alcohol a couple of times per month and might have four drinks in an evening. (Tr. 563-64.)   He stated he can handle this amount of alcohol. (Tr. 564.)

F.      **Third-Party Witness Testimony**

At the August 2, 2006 administrative hearing, Mr. Dick Carlson, resource counselor, testified that he first met Mr. Todd in August of 2004 in his capacity as Mr. Todd's independent living skills worker. (Tr. 566-67.)  Mr. Carlson testified that he has met with Mr. Todd for an average of two hours per week since August 2004 to help him complete tasks like filling out forms for the county or the state, assisting with grocery procurement, helping him with finances,

and helping him prepare for doctor appointments.  (Tr. 568.)  Since August 2004, Mr. Carlson testified that Mr. Todd's display of stress with respect to decision-making is increasing, and Mr. Todd displays this by getting angry or boisterous over major and minor issues. (Tr. 568.) Specifically, Mr. Carlson testified that Mr. Todd could not control himself and became demonstratively angry and threw a pencil when Mr. Carlson told him he could not spend his $100 rent credit check on a DVD. (Tr. 570-71.)

Mr. Carlson testified that Mr. Todd could not live independently because he needs the structure provided by assisted living. (Tr. 569-70.)  He testified that Mr. Todd could not work full time without a job coach because his stress level goes "off the charts" if he has to think in more than one area, and you can see the stress level displayed in his body language and his verbiage. (Tr. 571-72.)  For example, while working at Arby's, if Mr. Todd had to alter the condiments from one hamburger to another, his work ability is diminished and he would go into a negative mode and no longer be able to function appropriately.  (Tr. 572-73.)

Finally, Mr. Carlson testified that when Mr. Todd is not stressed out, he ordinarily has a pleasant manner and personality, which "without question" misleads people as far as his limitations. (Tr. 573.)

Mr. Michael Todd, Mr. Todd's brother and appointed conservator since 2003, testified at the administrative hearing that he was appointed conservator because his brother was unable to manage his finances and paperwork, leading to a 2001 bankruptcy filing.  (Tr. 99, 106, 164, 178.)  Michael Todd testified that he sees his brother four to six times per year.  (Tr. 574.)  He testified that he and Mr. Todd's primary physician believe Mr. Todd should not have a driver's license due to his history of accidents and concerns about his good judgment and low blood

sugar incidents.  (Tr. 574-76.)  He testified he believes Mr. Todd's license is pending state

suspension.  (Tr. 576.)   Michael Todd testified that his brother does not have the ability to

recognize symptoms of low blood sugar and act accordingly to counteract that problem, but

testified that Mr. Todd would likely disagree with that assessment. (Tr. 577-78.)  Michael Todd

testified that Mr. Todd could not live independently, especially after the two low blood sugar

emergencies. (Tr. 581.)

Michael Todd testified that his brother could not do a simple, low-stress job for eight

hours a day, five days a week because Mr. Todd displays a lack of good follow through and

displays inconsistency. (Tr. 578-79.)   He testified that impulsivity, good judgment and "keeping

a cool head" have been a problem for Mr. Todd since his TBI. (Tr. 579-580.)  Mr. Todd used to

work at the same manufacturing company for which Michael Todd still works as a controller,

and Mr. Todd could not do the simple job of putting plastic bottles on an assembly line without

losing his temper and throwing bottles at other employees. (Tr. 581-82.)  He stated that it is very

difficult for Mr. Todd to do a job on a long term basis. (Tr. 582.)  Michael Todd also testified

that the stress of a daily job would negatively affect Mr. Todd's ability to control his diabetes.

(Tr. 579-580.)

### G.    Medical Expert's Testimony

Dr. Karen H. Butler testified at the August 2, 2006 administrative hearing as a medical

expert having reviewed the medical evidence.  (Tr. 582-83.)  Dr. Butler testified that Mr. Todd is

diagnosed either with dementia due to head trauma or a cognitive disorder NOS due to a TBI.

(Tr. 583.)  He is also diagnosed with dysthymia, as well as alcohol and cannabis dependence.

(Tr. 584.)  Dr. Butler testified that  Mr. Todd has difficulties with decreased judgment, decreased

insight, difficulties with multi-tasking, personality change secondary to the TBI, mental control, non-verbal memory, learning, impulsivity, vulnerability to harm, behavioral control, time and money management, and difficulties with fine motor speed.  (Tr. 584-85.)  Mr. Todd also has problems with hypoglycemia related to diabetes, and with drinking alcohol. (Tr. 586.)

Dr. Butler testified that Mr. Todd's daily activities were moderately impaired, and that his social functioning was moderately impaired.  (Tr. 586-87.)  Overall, based on a blending of the test results in the medical record,  Dr. Butler testified that his concentration, pace, and persistence was moderately impaired.  (Tr. 587-88.)  She testified that Mr. Todd had one episode of decompensation from May 16, 2002 through June 16, 2002 while at the Vinland Center being treated for alcohol and cannabis dependence.  (Tr. 588.)  Dr. Butler testified that although Mr. Todd's condition was severe, he did not meet or equal a listing. (Tr. 583.)

Dr. Butler testified that she would impose the following limitations in a work setting: work that was simple and unskilled, work where there would be no multi-tasking, work where there would be low to moderate standards of pace and production, work with brief, incidental public contact, work in an alcohol-free setting, and work with brief and superficial contact with co-workers but where he would have an independent task and would not really be working with co-workers.  (Tr. 589.)  Dr. Butler also testified that it is common for individuals who have suffered head injuries, like Mr. Todd, to assume their functioning level is higher than it actually is.  (Tr. 593.)  She said that assuming the medical experts who found Mr. Todd lacks insight into his limitations are correct, that his lack of insight would detract from the weight that should be given Mr. Todd's statement that he could live alone or perform a full-time, low-stress job. (Tr. 592-93.)

### H.     Vocational Expert's Testimony

Mr. Mitchell Norman testified at the August 2, 2006 administrative hearing as a vocational expert. (Tr. 593-94.)  The ALJ posed a hypothetical question for Mr. Norman to consider.  (Tr. 594-95.)  The ALJ asked Mr. Norman to consider a male person of the age range of 44 to 48 years old, who has a 12th grade education and some vocational training in electronic technician work. (Tr. 594.)  This person has past work as set out in Mr. Norman's report, and has the impairments noted by the doctors in the record, which includes diabetes. (Tr. 594.)  This person has some other impairments that are non-severe or acute in nature, which result in some limitations.  (Tr. 595.)  This person has the limitations for work that Dr. Butler previously testified to, and is therefore limited to work that is unskilled, work that is simple with no multi-tasking, work with low to moderate standards of pace and production, work where the person does not have more than incidental public contact as part of the person's job tasks, work where there is only brief, superficial contact with co-workers, and work in an alcohol free setting.  (Tr. 595.)  This person is also limited to a job that is routine and repetitive. (Tr. 596.)  Mr. Norman testified that a person with these hypothetical limitations could not perform any of Mr. Todd's past relevant jobs, but that there are two jobs that this person could perform – the unskilled position "Assembler II" (DOT # 723.684-018, 2,800 jobs available) and the unskilled position "Weld Inspector" (DOT # 724.685-014, 1,400 jobs available.)  (Tr. 595-96.)

Mr. Norman testified that if Mr. Todd required a job coach, he would not be a competitive candidate for these positions.  (Tr. 597.)  He also testified that if Mr. Todd were to throw the objects involved in the assembler or weld inspector positions, that type of behavior would not be tolerated in a competitive work situation.  (Tr. 597.)  Mr. Norman testified that if

an individual, due to fatigue, needed to take more breaks than allowed in a normal production

setting (e.g., one 15-minute break every four hours) that such a requirement would preclude

competitive employment in the unskilled positions of assembler II or weld inspector. (Tr. 597.)

### I.      The ALJ's Decision

In determining whether or not Mr. Todd was disabled, the ALJ followed the five-step

sequential analysis outlined at 20 C.F.R. §404.1520.  At the first step of the analysis, the ALJ

determined that Mr. Todd had not engaged in substantial gainful activity at any time relevant to

this decision.  (Tr. 24.)  The second step in the sequential evaluation is to determine whether or

not Mr. Todd has a severe impairment, defined as a medically determinable impairment or

combination of impairments that significantly limits the individual's physical or mental ability to

do basic work activities.  (Tr. 24. )  The ALJ found that Mr. Todd had the following severe

impairments based on the requirements of 20 C.F.R § 404.1520(c):  dementia versus a cognitive

disorder; dysthymia; alcohol and cannabis dependence; and diabetes. (Tr. 32.)   The third step in

the analysis requires a comparison of the claimant's severe impairments with the impairments

listed in Appendix 1, Subpart P, Regulation No. 4, Listing of Impairments.  (Tr. 32.)  The ALJ

concluded that Mr. Todd's impairments, alone or in combination, were not severe enough to

meet or medically equal any listed impairments.  (Tr. 32.)  The last two steps in the evaluation

require the ALJ to determine whether the claimant has the residual functional capacity ("RFC,")

despite his impairments, to perform his past relevant work or any other work existing in

significant numbers in the national economy. (Tr. 24, 32; 20 C.F.R. §404.1565.)  In determining

Mr. Todd's RFC, the ALJ considered the medical record, documents submitted by third parties

familiar with Mr. Todd, Mr. Todd's testimony, Mr. Michael Todd's testimony, resource

counselor Mr. Dick Carlson's testimony, the medical expert's testimony, the vocational expert's testimony, and the credibility of Mr. Todd's subjective complaints. (Tr. 27-30.)   The ALJ concluded that Mr. Todd has the following RFC:  he can perform no more than simple, unskilled work; he cannot perform multi-tasking; he can meet the demands of no more than low to moderate pace and production; he can tolerate no more than incidental contact with the public; he can tolerate no more than brief and superficial contact with coworkers and must perform work tasks independent of coworkers and requires an environment free of alcohol.  (Tr. 32.)

In making the RFC determinations, the ALJ placed some weight on medical expert Dr. Butler's testimony because she demonstrated great familiarity with the record and has considerable experience determining work-related limitations for individuals.  (Tr. 27. ) Dr. Butler testified that with respect to Mr. Todd's mental impairments, appropriate work-related limitations include simple, unskilled work, no multi-tasking, work requiring no more than low to moderate standards for pace and production, brief and superficial contact with coworkers, no more than incidental contact with the public, and a work situation where his tasks are independent rather than performed with coworkers, and an environment free of alcohol.  (Tr. 27.) The ALJ placed some weight on Dr. Sarff's opinion that Mr. Todd may avoid close social contact at work and might prefer to work independently.  (Tr. 27.)  The ALJ placed great weight on treating physician Dr. Hoggarth's 2002 opinion that Mr. Todd could perform work that did not require close contact with coworkers because Dr. Hoggarth is a treating source. (Tr. 27.)  The ALJ placed some weight on Dr. Carlson's opinion of Mr. Todd's IQ and nonverbal processing difficulty.  (Tr. 27.)  The ALJ did not state how much weight Dr. Daniewicz's testimony was given in making the RFC determination.  (Tr. 27. )  The ALJ did not place significant weight on

the Vinland Center case manager's assessment of Mr. Todd. (Tr. 27-28.) The ALJ considered

Dr. Scott's observations on Mr. Todd's introversion and social avoidance in determining an

appropriate RFC. (Tr. 28.) The ALJ gave some weight to the opinions of the reviewing State

Agency physicians and psychologists that Mr. Todd's physical impairments were non-severe,

but found that the record indicates Mr. Todd's diabetes is indeed a severe impairment. (Tr. 28.)

The ALJ placed great weight on treating physician Dr. Langer's opinion that Mr. Todd

has significant difficulty with concentration, memory, frustration, and anger management. (Tr.

28.) The ALJ gave no weight to Dr. Walker's statement because substantial evidence in the

record contradicts her finding that Mr. Todd is disabled, and because the record suggests her

examination of Mr. Todd was not as thorough as Dr. Sarff's and Dr. Carlson's examinations,

neither of which opined that Mr. Todd was disabled. (Tr. 28.) The record did not show that Mr.

Todd has physical limitations although he does have diabetes. (Tr. 29.)

The ALJ considered the opinion of Ms. Forsyth, Mr. Todd's career rehabilitation

counselor, who opined that Mr. Todd would need much support in any future employment and

could not work full time. (Tr. 29.) However, her opinion is not substantiated by significant

evidence in the medical record, and since Ms. Forsyth is a non-recognized medical source, her

opinion does not qualify for the degree of weight that would be given to a physician or

psychologist. (Tr. 29.) The ALJ gave Mr. Carlson's opinion less weight than a medical source,

and noted that Mr. Carlson's opinion that Mr. Todd is quite limited is not supported by the

record as a whole. (Tr. 29.) The ALJ considered the testimony of Mr. Todd's brother, Mr.

Michael Todd, but noted that as a family member and Mr. Todd's conservator, Michael Todd has

an incentive to endorse the claimant's disability application.

21

The ALJ found that Mr. Todd's allegations regarding his limitations were not totally credible because his limited use of medication and limited treatment for any mental conditions suggests that he functions at a higher level than is alleged, because his level of daily activity is inconsistent with his allegation of disability, and because his work activity since the date of alleged disability is inconsistent with his allegation that he believes he is unable to work. (Tr. 30-32. ) However, the ALJ accepted the opinion of vocational expert Mr. Norman that Mr. Todd is unable to perform any of his past relevant work as defined in 20 C.F.R. § 404.1565. (Tr. 31-32.)

Conducting the last step of the analysis, the ALJ asked the vocational expert whether jobs exist in the national economy for an individual of Mr. Todd's age, education, past relevant work experience and RFC as determined. (Tr. 31.)  The ALJ accepted the opinion of the vocational expert that, assuming the hypothetical individual's specific work restrictions, he is able to make a vocational adjustment to work existing in significant numbers in the national economy, including as an assembler  (2,800 jobs existing in the relevant region)  and as a welding inspector (1,400 jobs existing in the relevant region.) (Tr. 31-32.)  Therefore, the ALJ concluded that Mr. Todd was not disabled within the meaning of the Social Security Act at any time through the date of the decision of August 29, 2006.  (Tr. 31,33; 20 C.F.R. § 404.1520(g).)

### III.  STANDARD OF REVIEW

Judicial review of the final decision of the Commissioner is restricted to a determination of whether the decision is supported by substantial evidence on the record as a whole.  *See* 42 U.S.C. § 405(g); *see also Qualls v. Apfel*, 158 F.3d 425, 427 (8th Cir.1998); *Gallus v. Callahan*, 117 F.3d 1061, 1063 (8th Cir.1997); *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir.1989).

Substantial evidence means more than a mere scintilla; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co., v. NLRB*, 305 U.S. 197, 220 (1938)). In determining whether evidence is substantial, a court must also consider whatever is in the record that fairly detracts from its weight. *See Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir.1999); *see also Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir.1989) (citing *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)).

A court, however, may not reverse merely because substantial evidence would have supported an opposite decision. *See Roberts v. Apfel*, 222 F.3d 466, 468 (8th Cir.2000); *see also Gaddis v. Chater*, 76 F.3d 893, 895 (8th Cir.1996). "As long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome . . . or because we would have decided the case differently. *Roberts v. Apfel*, 222 F.3d at 468. (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir.2000); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir.1993)). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id*. Therefore, our review of the ALJ's factual determinations is deferential, and we neither re-weigh the evidence, nor review the factual record de novo. *See Flynn v. Chater*, 107 F.3d 617, 620 (8th Cir.1997); *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir.1996). The Court must "defer heavily to the findings and conclusions of the SSA." *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir.2001).

Disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12

months." 20 C.F.R. § 404.1505(a).  In making the disability determination the Secretary

promulgated a sequential evaluation process which applies to both physical and mental

disorders.  20 C.F.R. §404.1520 outlines the five-step sequential process used by the ALJ to

determine whether a claimant is disabled.  The disability determination requires a step-by-step

analysis.  *See* 20 C.F.R. §404.1520(a).  At the first step, the ALJ must consider Plaintiff's work

history.  At the second step, the ALJ must consider the medical severity of Plaintiff's

impairments.  At the third step, the ALJ must consider whether Plaintiff has an impairment or

impairments that meet or equals one of the listings in Appendix 1 to Subpart P of the regulations.

*See* 20 C.F.R. 404.1520(d).  If Plaintiff's impairment does not meet or equal one of the listings in

Appendix 1, then the ALJ must make an assessment of Plaintiff's residual functional capacity

and Plaintiff's past relevant work.  If the ALJ determines that the claimant can still perform his

or her past relevant work, the ALJ will find that the claimant is not disabled.  If the claimant

cannot perform his or her past relevant work, then the "burden shifts to the Commissioner to

prove, first, that the claimant retains the [RFC] to perform other kinds of work, and, second, that

other such work exists in substantial numbers in the national economy."  *Cunningham v. Apfel*,

222 F.3d 496, 501 (8th Cir. 2000).

## IV.  CONCLUSIONS OF LAW

### A.  The ALJ Failed In His Duty to Fully Develop the Medical Record And Made Improper Inferences From the Medical Evidence.

The first issues are whether the ALJ failed to fully develop the medical record and

whether the ALJ improperly made his own inferences from the medical record.  It is well-settled

law that it is the duty of the ALJ to fully and fairly develop the record, even when the claimant is

24

represented by counsel. *Nevland v. Apfel,* 204 F.3d 853, 857 (8th Cir. 2000) (citing *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir.1983)). Additionally, "an administrative law judge may not draw upon his own inferences from medical reports." *Id*. at 858 (citing *Lund v. Weinberger*, 520 F.2d 782, 785 (8th Cir.1975)); *see also Landess v. Weinberger*, 490 F.2d 1187, 1189 (8th Cir.1974); *Willem v. Richardson*, 490 F.2d 1247, 1248-49 n. 3 (8th Cir.1974). Throughout the ALJ's 2006 opinion, the ALJ repeatedly relies on the *lack* of statements specifically stating Mr. Todd cannot work full time to prove that Mr. Todd could indeed work full time. (Tr. 27-30.) This analysis is logically flawed. The fact that Mr. Todd's treating physicians, for example, did not state verbatim, "Mr. Todd is disabled and cannot work full time," is an absence of evidence from which two inferences could equally be drawn: 1) the treating physicians believe Mr. Todd can work full time, or that 2) the treating physicians do not believe Mr. Todd can work full time. In this situation, the ALJ had a duty to develop the record with respect to this point instead of making his own inferences. *Nevland*, 204 F.3d at 857. Moreover, it becomes clear that the ALJ's inferences were incorrect when considering the evidence from Dr. Langer and Dr. Hoggarth submitted after the hearing. (Tr. 543-46.) Both doctors specifically clarified that, at the time they examined Mr. Todd, they did not believe Mr. Todd could work full time. *Id.* Further, both doctors stated that they do not typically provide an opinion about whether a client could or could not work full time unless specifically requested to do so. *Id.*

In addition to his flawed assessment of Dr. Langer and Dr. Hoggarth's records, the ALJ uses the same logically flawed reasoning in assessing the evidence provided by the following sources : Dr. Daniewicz ("she does not state that the claimant cannot or should not work"); Dr. Scott ("Dr. Scott does not make a statement as to whether the claimant can work or what kinds of

limitations he would require in a work setting."); Dr. Sarff and Dr. Carlson ("Neither Dr. Sarff or Dr. Carlson expressed the opinion that the claimant is disabled."); Ms. Spalding ("she does not suggest that he is incapable of working"); Mr. Carlson ("While Mr. Carlson portrays the claimant as quite limited, he does not indicate that the claimant is unable to work."), and; Ms. Johnson and Ms. Besser ("neither of these sources state the claimant is unable to work").   The opinion of the only source that clearly and specifically stated Mr. Todd is disabled, Dr. Walker, was not given significant weight by the ALJ. (Tr. 28.)  To the extent that the record was unclear whether the medical sources or other sources believed Mr. Todd could work a full-time job, the ALJ had a duty to fully develop the record instead of making his own inferences from the record.

In another species of flawed analysis, the ALJ infers from sources who state that Mr. Todd was attempting to find *part-time* work or had completed *part-time* work (*e.g.*, Dr. Hoggarth, Ms. Spalding, Ms. Forsyth, Ms. Johnson, Ms. Besser, and Mr. Todd) that Mr. Todd could work *full time*.  (Tr. 27, 29-30.)  This inference is seriously troubling because a claimant's "RFC is the maximum remaining ability to do sustained activities on a "regular and continuing basis" (eight hours a day, five days a week).  1 Harvey L. McCormick, *Social Security Claims and Procedure* § 8:89 (5th ed. 1998).  Social Security Ruling 96-8p provides:  (1) Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  Social Security Ruling 96-8p, 61 Fed. Reg. 34474 (July 2, 1996).  A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule." *Id.*  Therefore, because RFC depends on the ability to work full time, it is critical that the ALJ distinguish between evidence tending to show that Mr. Todd could work a part-time job and evidence tending to show Mr. Todd could work a

full-time job.  To the extent that the record was unclear whether the sources believed that Mr.

Todd could work a full-time job, the ALJ had a duty to fully develop the record instead of

making his own inferences from the record.

Having the benefit of clarification from Dr. Langer and Dr. Hoggarth, whose opinions the

ALJ purported to give "great weight," we now know that neither treating physician believed that

Mr. Todd could work full time.  Therefore, because the ALJ gave great weight to Dr. Langer's

opinion and Dr. Hoggarth's opinion in determining Mr. Todd's RFC and in determining that

significant jobs exist in the national economy that Mr. Todd could perform, and because we now

know that Dr. Langer and Dr. Hoggarth's opinions were truly the opposite of what the ALJ

believed them to be, substantial evidence does not support the ALJ's finding that Mr. Todd can

perform jobs in the national economy.

**B.  The ALJ Erred In Determining Mr. Todd's RFC and the Commissioner Failed To Meet The Burden to Show Mr. Todd Can Perform Jobs in the National Economy Because Substantial Evidence Does Not Support A Finding that Mr. Todd Can Work Full Time.**

We now turn to a discussion of how the ALJ's analysis affected Mr. Todd's RFC

determination and the resulting determination that jobs exist in significant numbers that Mr.

Todd can perform.  First, inferences now shown to be both improper and incorrect cannot

constitute substantial evidence.  As discussed above, we have determined that the ALJ made

improper and incorrect inferences from the medical record, including from the treating

physicians' opinions.  (Tr. 27-28.)  Second, the opinions of doctors who have not examined the

claimant ordinarily do not constitute substantial evidence on the record as a whole.  *Jenkins v.

Apfel*, 196 F.3d 922, 925 (8th Cir.1999). The ALJ purports to give "some weight" to the opinion

of non-treating, non-examining physicians who reviewed the record.  "Some weight" was given

to the opinion of the State Agency physicians and psychologists, and "some weight" was ostensibly given to the testimony of medical expert Dr. Butler. (Tr. 27-28.)   However, a closer examination of the ALJ's RFC determination and the RFC suggested by Dr. Butler shows that the ALJ relied heavily on the non-examining medical expert's testimony.  Dr. Butler concluded that Mr. Todd has the following RFC: work that was simple and unskilled, work where there would be no multi-tasking, work where there would be low to moderate standards of pace and production, work with brief, incidental public contact, work in an alcohol-free setting, and work with brief and superficial contact with co-workers but where he would have an independent task and would not really be working with co-workers.  (Tr. 589.)   The ALJ's RFC determination is almost exactly the same:  he can perform no more than simple, unskilled work; he cannot perform multi-tasking; he can meet the demands of no more than low to moderate pace and production; he can tolerate no more than incidental contact with the public; he can tolerate no more than brief and superficial contact with coworkers and must perform work tasks independent of coworkers and requires an environment free of alcohol.  (Tr. 32.)  It is clear, then, that the ALJ relied heavily on the opinion of non-examining doctors and improper inferences in determining Mr. Todd's RFC.  Therefore, the RFC determination is not supported by substantial evidence in the record.

### 1.      The Commissioner Failed to Meet The Burden To Show Mr. Todd Can Perform Jobs In The National Economy.

Even though the ALJ used an RFC that arguably overstates Mr. Todd's abilities in that it assumes he can work full time, the ALJ nevertheless determined at step four of the analysis that Mr. Todd could not perform his past relevant work as defined in 20 C.F.R.416.960.   At that

point, the ALJ moved to step five of the analysis, where the burden shifted to the Defendant

Social Security Administration to show that other jobs exist in significant numbers in the

national economy that Mr. Todd can perform, given his age, education, relevant work history,

and RFC.  *Cunningham v. Apfel*, 222 F.3d 496, 501 (8th Cir.2000).  A hypothetical question put

to a vocational expert must accurately set forth a claimant's impairments and resulting functional

limitations so that the expert can realistically assess the availability of jobs.  *Brenner v.*

*Schweiker*, 711 F. 2d 96, 99 (8th Cir. 1983); see also *Douglas v. Bowen*, 836 F. 2d 392 (8th Cir.

1987).  The testimony of a vocational expert who responds to a hypothetical based on an RFC

determined from evidence from non-treating physicians is not substantial evidence upon which

to base a denial of benefits.  *Nevland*, 204 F.3d at 858; *Jenkins,* 196 F.3d at 925.

Here, using the vocational expert's response to a hypothetical based on an RFC

determined from non-treating physician Dr. Butler and the non-treating State Agency physicians,

the ALJ concluded that jobs exist in the national economy that Mr. Todd could perform, such as

those of an assembler and a welding inspector.  (Tr. 31.)  It follows that substantial evidence

does not support this finding because the vocational expert responded to a hypothetical based on

an RFC determined from the opinion of non-treating physicians in addition to improper,

incorrect inferences that Mr. Todd could work full time.  Both of the jobs the vocational expert

testified Mr. Todd could perform - and indeed any job meeting Social Security regulation

requirements for jobs existing in significant numbers in that national economy – demand that Mr.

Todd work full time, eight hours per day, five days per week.  Thus, the Commissioner, as a

matter of law, did not meet the burden to show that Mr. Todd could perform jobs existing in the

national economy.

**C.  The Record Fully Supports A Determination That Mr. Todd is Disabled As a Matter of Law And Entitled To Benefits.**

In his opinion, the ALJ determined that Mr. Todd was not eligible for disability benefits because the Commissioner met the burden to show Mr. Todd can perform jobs existing in significant numbers in the national economy.  The Court has determined that substantial evidence did not support this determination.  It follows that if substantial evidence on the record supports the opposite conclusion – that the Commissioner did not meet the burden to show Mr. Todd can perform jobs existing in the national economy and that the Commissioner cannot meet this burden – then Mr. Todd should be deemed disabled within the meaning of the Social Security Act and eligible for disability benefits.  *See Dollar v. Bowen,* 821 F.2d 530, 532-535 (10th Cir. 1987).

The Commissioner did not meet this burden.  By definition, as discussed above, to show that Mr. Todd can adjust to other jobs in the national economy, the Commissioner must show that Mr. Todd can work full time.  The record fully supports a finding that Mr. Todd cannot work full time.  Substantial evidence on the record also supports a finding that in order to maintain employment in any full-time job setting Mr. Todd would need support and/or accommodations that would preclude Mr. Todd from competitive employment in the national economy.

With respect to the contention that Mr. Todd cannot work full time, the record shows that both of Mr. Todd's treating physicians, Dr. Hoggarth and Dr. Langer, opined that at the time they examined Mr. Todd he was not able to work full time.[7] (Tr. 543-46.)  The treating physician

---

[7] These supplemental opinions were obtained as a result of a questionnaire submitted to the doctors after the 2006 hearing, and were submitted to the Appeals Council as part of the record. (Tr. 543-544.) The regulations provide that the Appeals Council must evaluate the entire record, including any new and material evidence that relates to the period before the date of the

rule provides that a treating physician's opinion on the subject of diagnosis and nature and

degree of impairment is binding on the fact finder unless contradicted by substantial evidence

and is entitled to some extra weight because the treating physician is usually more familiar with

a claimant's medical condition than are other physicians.   *Kelley v. Callahan*, 133 F.3d 583, 589

(8th Cir. 1998); 1 Harvey L. McCormick, *Social Security Claims and Procedure* § 8:103 (5th ed.

1998).   The ALJ placed "great weight" on the opinions of treating physicians Hoggarth and

Langer. (Tr. 27, 28.)  Also, other physicians who examined Mr. Todd conducted testing that

indicated Mr. Todd could not work full time.  Dr. Scott, who saw Mr. Todd for 19 sessions in

2002 and 2003, assessed Mr. Todd's GAF score at 50, which is indicative of serious impairment

in occupational functioning, as in an inability to keep a job. (Tr. 336, DSM-IV at 32.)  In 2004,

Dr. Walker assessed Mr. Todd's GAF score at 40, which is indicative of major impairment in

areas such as work, judgment or thinking, as in being unable to work. (Tr. 345-346, DSM-IV at

32.) Dr. Walker opined that Mr. Todd was "certainly disabled."  (Tr. 346.)  In 2005, Dr.

Daniewicz assessed a GAF score of 45 to 50 in her initial September interview and in November

2005 assessed a GAF score of 40 to 45, both ranges being indicative of an inability to work.[8]

(Tr. 520.)  Furthermore, when Dr. Daniewicz conducted testing with Mr. Todd, she found it

necessary to keep his sessions to no more than 1.5 hours at a time because he appeared to fatigue

---

ALJ's decision. 20 C.F.R. § 404.970(b). The newly submitted evidence thus becomes part of the
"administrative record," even though the evidence was not originally included in the ALJ's
record. *Cunningham*, 222 F.3d at 500 (citing *Nelson v. Sullivan*, 966 F.2d 363, 366 (8th
Cir.1992)). Here, the Appeals Council denied review. In these circumstances, we determine
whether the record as a whole, including the new evidence, supports the ALJ's determination. *Id.*

[8] The ALJ did not state how much weight he gave to Dr. Daniewicz's opinion in making
his disability determination.  (Tr. 27.)

easily after an hour and became more easily frustrated, impulsive, and haphazard. (Tr. 529.)  The

vocational expert stated that if a person was only able to tolerate an hour and a half in a testing

setting he would want to discuss it with the psychologist who did the testing.  (Tr. 597-598.)

Second, substantial evidence in the record from sources with vocational expertise who

have worked with Mr. Todd supports the a finding that in order to maintain employment in any

full-time job setting Mr. Todd would need support and/or accommodations that would preclude

him from competitive employment in the national economy.  Ms. Spalding, a human services

professional, stated that Mr. Todd had lost jobs due to his inability to work well with others and

perform job tasks. (Tr. 178, 338.)  Mr. Forsyth, a career rehabilitation professional, stated that he

demonstrates poor frustration tolerance, quickly shuts down when he is unable to complete a task

will need much preparation for community employment, and will need much support with his

future employment. (Tr. 339.)   Ms. Forsyth stated that she expects Mr. Todd will be extremely

limited in the number of hours he will be able to work because of the fatigue and stress that will

result with employment.  *Id.*  Ms. Besser, a vocational professional, stated that Mr. Todd is a

hard worker and wants to work, but his limitations interfere with finding and maintaining

competitive employment. (Tr. 396.)   Mr. Carlson, Mr. Todd's resource counselor, testified that

Mr. Todd could not work full time without a job coach. (Tr. 571-72.)  The vocational expert

testified that if Mr. Todd required a job coach, he would not be a competitive candidate for the

positions of assembler II or welding insctor.  (Tr. 597.)  The vocational expert also testified that

if an individual, due to fatigue, needed to take more breaks than allowed in a normal production

setting (*e.g.*, one 15-minute break every four hours), such a requirement would preclude

competitive employment in the unskilled positions of assembler II or weld inspector. (Tr. 597.)

Even the non-examining State Agency psychologist Dr. Korgeski found that Mr. Todd had a moderately limited ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and a moderately limited ability to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 314-15.) Dr. Shields, another non-examining State Agency psychologist, affirmed Dr. Korgeski's report. (Tr. 314, 319.)

Lastly, Michael Todd testified that his brother could not do a simple, low-stress job for eight hours a day, five days a week because Mr. Todd displays a lack of good follow through and displays inconsistency. (Tr. 578-79.) He testified that impulsivity, good judgment and "keeping a cool head" have been a problem for Mr. Todd since his TBI. (Tr. 579-580.) Michael Todd stated that it is very difficult for Mr. Todd to do a job on a long-term basis. (Tr. 582.) He also testified that the stress of a daily job would negatively affect Mr. Todd's ability to control his diabetes. (Tr. 579-580.) The ALJ "considered" Michael Todd's testimony but did not afford it much weight because Michael Todd is a relative and therefore has an incentive to endorse Mr. Todd's disability application. (Tr. 30.) Nevertheless, Michael Todd's testimony is consistent with the evidence in the record showing Mr. Todd is unable to work full time.

In determining whether evidence is substantial, a court must also consider whatever is in the record that fairly detracts from its weight. *See Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir.1999); *see also Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir.1989) (citing *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The ALJ found Mr. Todd not to be a credible witness, but appeared to use Mr. Todd's statements about his abilities and daily activities to show that he is not disabled. (Tr. 32, 555-66.) Where adequately explained and

supported, credibility determinations are the province of the ALJ.  *Lowe v. Apfel*, 226 F.3d 969,

972 (8th Cir. 2000.)  However, a determination that Mr. Todd is not a credible witness tends to

show that Mr. Todd is in fact disabled, especially where the medical expert testified that it is

common for individuals with TBI frontal-lobe injuries, like Mr. Todd, to believe they can

function at a higher level than they actually are able to function.  (Tr. 593.)  Dr. Butler's

observation is borne out by evidence in the record showing that Mr. Todd lacks insight into his

situation.  Dr. Scott observed that Mr. Todd was significantly impaired in terms of his ability to

develop insight into his situation. (Tr. 337.) The Vinland Center reports stated that Mr. Todd

lacks insight.  (Tr. 217-18.)  Ms. Forsyth also stated that Mr. Todd has very minimal insight into

his limitations. (Tr. 339.)

    Additionally, although Mr. Todd stated, for example, that he could work a low-stress full

time job, live independently, and drive safely, these statements are not corroborated in the

record. (Tr. 555-66.)  Both Mr. Carlson and Michael Todd testified that Mr. Todd could not live

independently.  (Tr. 570-71, 581.)  Mr. Carlson testified that Mr. Todd cannot manage his

finances and, gets demonstratively angry over minor issues, and threw a pencil after being told

he could not spend money on a DVD.  (Tr. 570-71.).  Mr. Todd used to work at the same

manufacturing company for which Michael Todd still works as a controller, and Michael Todd

testified that Mr. Todd could not do the simple job of putting plastic bottles on an assembly line

without losing his temper and throwing bottles at other employees.  (Tr. 581-82.)  Michael Todd

also testified that Mr. Todd overstates his abilities with respect to driving, that the state has

suspended Mr. Todd's license, and that Mr. Todd should not have a license because he does not

have the ability to recognize symptoms of dangerous low blood sugar. (Tr. 574-576.)  Mr.

Carlson testified that when Mr. Todd is not under stress, he normally has a pleasant manner and personality, which "without question" misleads people as far as his limitations.  (Tr. 573.)  Thus, the evidence in the record showing that Mr. Todd overstates his abilities, combined with the ALJ's finding that Mr. Todd was not a credible witness and the medical expert's opinion that persons with Mr. Todd's mental limitations often overstate their abilities, shows that Mr. Todd's statements about his abilities and his daily activities do not fairly detract from the weight of substantial evidence showing he cannot work full time.  We thus conclude that the record fully supports a determination that Mr. Todd was disabled as a matter of law and is entitled to benefits.

### D. Remanding the Case to the ALJ Would Serve Only To Further Delay The Proceedings.

The Commissioner has not met the burden of coming forward with substantial evidence showing that Mr. Todd can perform jobs existing in significant numbers in the national economy.  We therefore reverse the Commissioner's decision.  In so doing, we may choose to remand for further hearing or to remand with the direction that disability benefits be awarded. *Frey*, 816 F.2d at 518; *Dixon v. Heckler*, 811 F.2d  506, 511 (10 th Cir. 1987)("[W]e believe that further administrative proceedings would only further delay the appropriate determination and award of benefits."); *Jackson v. Bowen*, 873 F. 3d 1111, 1114-115 (8th Cir. 1989); *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir.1984).  The Court finds no sound reason to remand the case to the ALJ to give the Secretary a third chance to build the record, especially given that Mr. Todd has been attempting to obtain benefits for almost seven years. *See*, *e.g.*,  *Dollar v. Bowen,* 821 F.2d 530, 536 (10th Cir. 1987)(reviewing court declines to remand, awards benefits after six year delay); *Frey v. Bowen*, 816 F.2d 508 (10th Cir.1987)(reviewing court declines to remand,

35

awards benefits after more than a six year delay). Therefore, we **REVERSE** the decision of the district court and **REMAND** to the Secretary for immediate calculation and award of benefits.

## V. RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff's Motion for Summary Judgment [#26] be **GRANTED**; and

2.      Defendant's Motion for Summary Judgment [#30] be **DENIED**.

3.      The Commissioner's decision should be **REVERSED** and the case **REMANDED** to the Secretary for the immediate calculation and award of benefits.


DATED: February 20, 2009                    _s/ Franklin L. Noel_____
                                            FRANKLIN L. NOEL
                                            United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **March 10, 2009**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.